**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CUSTOMEDIA TECHNOLOGIES, LLC, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 2:16-CV-129-JRG |
| DISH NETWORKS CORP., et al. | § | |
| | § | |
| | § | |

**CLAIM CONSTRUCTION**
**MEMORANDUM AND ORDER**

Before the Court is Plaintiff Customedia Technologies, LLC's ("Plaintiff's") Opening

Claim Construction Brief (Dkt. No. 36). Also before the Court are Defendants DISH Networks

Corporation and DISH Network LLC's (collectively, "Defendants'") response (Dkt. No. 42) and

Plaintiffs' reply (Dkt. No. 45).

The Court held a claim construction hearing on February 2, 2017.

**Table of Contents**

I. BACKGROUND.................................................................................................. 4

II. LEGAL PRINCIPLES ...................................................................................... 5

III. AGREED TERMS............................................................................................. 9

IV. DISPUTED TERMS IN U.S. PATENTS NO. 8,719,090 AND 9,053,494 ......................... 9

    A. "individually controlled and reserved advertising data storage section adapted specifically for storing the specifically identified advertising data" / "individually controlled and reserved advertising data storage section"...................................... 9

    B. "addressable and reserved storage space[s] for storing digital advertising data" / "addressable and reserved storage space for storing the particular advertising data"........ 18

    C. "customer specific advertising data"................................................................ 19

    D. "user suitability criteria" ............................................................................... 22

    E. "automatically"............................................................................................. 25

    F. "multimedia data products" ........................................................................... 26

    G. "digital multimedia data".............................................................................. 28

    H. "the suitability criteria data is collected by at least one method selected from the group consisting of . . ." .............................................................................. 29

    I. "the particular advertising data is configured for presentation to an end user by a method selected from the group consisting of . . ." ............................................. 32

V. DISPUTED TERMS IN U.S. PATENTS NO. 7,840,437 AND 8,955,029 ......................... 34

    J. "limited-use digital data" .............................................................................. 34

    K. "data supplier" ............................................................................................ 36

    L. "notifying a data supplier of said simulated return"........................................... 39

    M. "enacting a simulated return of said rented data" .............................................. 42

    N. "performing a virtual return of the [limited-use / stored rented] digital data that has been transferred to the portable playback device"............................................. 44

    O. "by deleting or scrambling said data from said built in storage device or blocking further access to said data" ............................................................................ 47

    P. "a storage device built in to the system and which is not removable from the system . . ."........................................................................................................... 49

    Q. "a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data" ...................... 49

    R. "a user interface operatively connected to said processing circuitry for programming one or more processing functions to be performed by said processing circuitry" / "a user interface operatively connected to the processing circuitry for programming the at least one processing function" ................................................................ 52

S.  "portable playback device" ................................................................................. 53

T.  "processing circuitry comprising software . . ." .................................................. 57

**VI.  CONCLUSION** ......................................................................................................... **62**

## I. BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 7,840,437 ("the '437 Patent"), 8,719,090 ("the '090 Patent"), 8,955,029 ("the '029 Patent"), and 9,053,494 ("the '494 Patent") (collectively, the "patents-in-suit"). Plaintiff submits that the patents-in-suit relate to managing data. (*See* Dkt. No. 36, at 4 & 17.)

The '090 Patent, titled "System for Data Management and On-Demand Rental and Purchase of Digital Data Products," issued on May 6, 2014, and bears an earliest priority date of June 12, 1997. The '494 Patent is a continuation of the '090 Patent.

The '437 Patent, titled "System for Data Management and On-Demand Rental and Purchase of Digital Data Products," issued on November 23, 2010, and bears an earliest priority date of June 12, 1997. The '029 Patent is a continuation of the '437 Patent.

The Abstract of the '090 Patent is representative and states:

A system for handling data and transactions involving data through the use of a virtual transaction zone, which virtual transaction zone removes the dependency of such transaction on the delivery medium of the product. The invention may reside and operate on a variety of electronic devices such as televisions, VCRs, DVDs, personal computers, WebTV, any other known electronic recorder/player, or as a stand alone unit. The transaction zone also provides a mechanism for combining mediums, data feeds, and manipulation of those feeds. The transaction zone also provides a mechanism for controlling the content, delivery, and timing of delivery of the end consumer's product.

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are set forth below within the discussion for each term.

## II. LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in

which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314–17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the

inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319–24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323–25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## III. AGREED TERMS

In their briefing (*see* Dkt. No. 42, at 1 n.1), the parties set forth their agreement as to the following terms in the patents-in-suit:

| Term | Agreement |
|---|---|
| "automatically"<br><br>(Claims 1, 5, and 6 of the '090 Patent; Claims 3 and 43 of the '494 Patent) | Plain meaning |
| "a storage device built in to the system and which is not removable from the system . . ."<br><br>(Claim 1 of the '437 Patent) | Plain meaning |

## IV. DISPUTED TERMS IN U.S. PATENTS NO. 8,719,090 AND 9,053,494

### A. "individually controlled and reserved advertising data storage section adapted specifically for storing the specifically identified advertising data" / "individually controlled and reserved advertising data storage section"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "individually controlled data storage section set aside just for storing specifically identified advertising data" |

(Dkt. No. 35, Ex. A, at 1; Dkt. No. 42, at 1; Dkt. No. 44, Ex. A, at 1–3.)  The parties submit that these terms appear in Claims 1, 4, and 8 of the '090 Patent.  (Dkt. No. 35, Ex. A, at 1; Dkt. No. 44, Ex. A, at 1.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "individually controlled data storage section set aside just for storing the specifically identified advertising data."

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "no intrinsic evidence requires departing from the plain and ordinary meaning of 'reserved,'" and Plaintiff argues that Defendants' proposal "is contrary to the explicit prosecution history" because "applicant removed from a draft version of the claims the very word 'only' that [Defendants] propose[] in effect to re-insert."  (Dkt. No. 36, at 6.)  Plaintiff urges that "[b]ecause Applicant and Examiner thoughtfully considered 'only' and Applicant choose to remove it, [Defendants] cannot re-insert 'only' by using instead 'set aside just for' . . . ."  (*Id.*, at 7.)  Plaintiff also argues that "there is no support in the specification that the reserved space must be used exclusively for content."  (*Id.*, at 9.)

Defendants respond that during prosecution the patentee "disclaimed the common use of reserved storage sections and instead claimed *specific* storage sections 'just for' storing advertising data . . . ."  (Dkt. No. 42, at 1.)  Defendants explain that "[b]ecause the Examiner could not find written description support for 'only,' Applicant removed 'only' . . . but maintained the 'specifically for storing' language . . . ."  (*Id.*, at 7.)

Plaintiff replies that Defendants are "attempting to limit the claim in a manner that was expressly rejected by the examiner and abandoned by the applicant during prosecution."  (Dkt. No. 45, at 1.)  Plaintiff also urges that "the specification and prosecution history teach that the claimed reserved storage space is memory allocated or reserved for advertising data, but that memory is not a completely separate structure or used 'only' for that data."  (*Id.*, at 2.)  Finally, Plaintiff proposes that if construction is found to be necessary, then Defendants' proposal of "set aside just for" should be replaced with "allocated."  (*Id.*, at 3; *see* Dkt. No. 47, Notice of Customedia's Corrected P.R. 4-5(d) Joint Claim Construction Chart, Ex. B, at 1–3 & 10–12.)

At the February 2, 2017 hearing, Plaintiff added that "reserved" simply means having control over what goes into the space that has been reserved.

<u>(2)  Analysis</u>

Claim 1 of the '090 Patent (from which Claims 4 and 8 depend) recites (emphasis added):

1.  A data delivery system for providing automatic delivery of multimedia data products from one or more multimedia data product providers, the system comprising:
      a remote account transaction server for providing multimedia data products to an end user, at least one of the multimedia data products being specifically identified advertising data; and
      a programmable local receiver unit for interfacing with the remote account transaction server to receive one or more of the multimedia data products and for processing and automatically recording the multimedia data products, said programmable local receiver unit including at least one *individually controlled and reserved advertising data storage section adapted specifically for storing the specifically identified advertising data*, said at least one advertising data storage section being monitored and controlled by said remote account transaction server and such that said specifically identified advertising data is delivered by said remote account transaction server and stored in said at least one individually controlled and reserved advertising data storage section.

The specification discloses:

. . . Programmable designation of advertising "sections" within VPR/DMS 30 internal storage areas.  These permanent or programmable "sections", "data boxes" or "spaces" are monitored and controlled by both content providers (or VPR/DMS 30 central data base) as well as by end users according to pre-set or negotiable criteria.  The designated advertising "sections" might be used for delivering advertising feeds, which are processed and recorded by VPR/DMS 30 system for real-time or subsequent viewing by end user.  These advertising data feeds might be mass distributed or broadcast to VPR/DMS 30 customers, or might be selectively distributed according to customer profiles, demographics, or other criteria.  Profile criteria can be established through analysis of customer activity history from on-line monitoring.  Alternatively, it may be developed from customer information inquiries acquired directly through system interaction or from outside customer profile data sources.  Advertising "sections" or "spaces" or "data boxes" may be reserved, rented, leased or purchased from end user, content providers, broadcasters, cable/satellite distributor, or other data communications companies administering the data products and services.  For example, a wide band, multi-media cable distributor may provide, lease or sell a cable "set top box" containing the VPR/DMS system.  This VPR/DMS 30 comprises a built-in non-movable storage device 14 which has certain areas that are reserved and

controlled by the cable company. These areas are available for commercial sales or leasing to others, who may include movie distributors, advertisers, data product suppliers, video game suppliers, video magazine publishers, or video product catalogue companies.

'090 Patent at 31:44–32:6.

During prosecution, the patentee repeatedly relied upon specific storage sections being "reserved" for advertising data:

> None of the cited prior art includes or suggests a system where specific storage sections of the local receiver unit are designated as advertising storage sections and are then *reserved specifically* for storage of advertising data. * * * In both Logan et al. and Herz et al., all storage can be used for any type of data storage. For example, there may be times when all storage is used for movie programming leaving no storage left for advertising. *In the aspect of applicant's system where specific advertising storage sections are provided, there is always storage provided for advertising data.* This is a significant and unobvious difference between the prior art systems and applicant's system.

(Dkt. No. 42, Ex. K, Nov. 2, 2007 Amendment, at 12 (emphasis added); *see id.*, Ex. L, June 2, 2008 Request for Reconsideration After Final, at 11 ("dedicated advertising data storage space").)

> Applicant's claimed system requires having a memory for the data transmitted from the head-end and having at least one advertising storage section in that memory *specifically reserved for advertising data* transmitted from the head-end. . . . It provides for *specifically dedicating a section of the memory for storage of advertising data as opposed to other programming data*, regardless of whether or not the other programming data may have a higher priority in some priority scheme.

(*Id.*, Ex. M, Dec. 9, 2008 Amendment, at 15 (emphasis added).)

> In the present Claim 1, a programmable local receiver unit is required which includes a memory divided into a plurality of individually controlled storage sections. This memory and the individual controlled storage sections are structural elements. The language "at least one of the plurality of individually controlled storage sections being *reserved* as an advertising data storage section specifically for storing advertising data" recites a structural limitation for the receiver which requires that structurally the receiver reserves at least one of the plurality of storage sections *just for* storing advertising data. This means that the programmable local receiver unit is configured or structured to *limit access* to at

- 12 -

> least one of the storage sections of the memory to *just advertising data*. One of
> the storage sections is structurally *set aside* for advertising data.

(*Id.*, Ex. B, June 17, 2009 Request for Reconsideration After Final, at 14 (emphasis added).)

The patentee then amended the limitation here at issue so as to recite that the section is "*adapted* specifically for storing *only* the specifically identified advertising data." (*Id.*, Ex. O, Oct. 21, 2009 Supplemental Amendment, at 14 (emphasis in original).) In response to a subsequent rejection that the word "only" lacked support in the specification, the patentee cited disclosure regarding "reserved" and cited dictionary definitions of "reserve" and "reserved." (*See id.*, Ex. N, June 18, 2010 Response, at 16 ("to 'reserve' a memory space for advertising data would mean to a person skilled in the art that such memory space is kept for only advertising data and only for that advertising data for which the specific storage space is 'reserved'") (emphasis omitted).)

The patentee ultimately removed the word "only" and instead relied upon the word "reserved." (*See id.*, Ex. P, Jan. 3, 2011 Amendment, at 16–17; *see also id.* at 18.) Nonetheless, the patentee continued to distinguish the "Logan" prior art reference because "the downloaded data as taught by Logan is simply stored in a storage device in a random fashion or in whatever memory locations are available" rather than in an "individually controlled and reserved storage section." (*Id.*, at 18 (emphasis omitted); *see id.* ("At best, Logan, again, simply teaches downloading data in a random fashion to memory and does not teach any monitoring or controlling of such memory, let alone a reserved advertising data storage section as recited in these claims.").)

In a Notice of Allowability, the Examiner set forth a section titled "Interpretation of Claim Language" and stated therein:

9.  A reserved storage section has been defined in the instant application to mean an allocation or assignment of a *uniquely identified portion of computer memory* (spec. para. [0186] and Microsoft Press Computer Dictionary definition of "storage location").  Reservation in this sense is analogous to reserving a *certain* hotel room for an indefinite period of time or buying a resort apartment under a time-share contract.

10.  This is a case where the limits of language failed the inventor.  "Reservation" is not uncommonly used in the prior art to mean any allocation of memory space.  And although the inventor's concept was known at the time of the invention (para. 14 below), it was so uncommon as to not have acquired its own name.  Today the instant invention might be called a "static allocation" of memory, but this term did not exist at the time of the invention (1999).

11.  The examiner was perhaps slow to catch on, but eventually concluded that the inventor met his burden for redefining the term reserved by disclosing "leased" and "purchased" storage.  Further support is provided by the disclosure that sections are reserved for the use of individual family members (spec. para. [0084] and [0173]) and for advertisers (spec para. [0179] and [0186]).  This implies complex scheduling that could be facilitated by making the allocation to *uniquely identified portions of computer memory*.

(Dkt. No. 42, Ex. A, July 10, 2013 Notice of Allowability, at 3–4 (emphasis modified).)[1]  The

Examiner thus found that the patentee used "reserved" in this context to refer to *exclusive*

allocation of a uniquely identified portion of storage.  The above-reproduced disclosure in the

specification is likewise consistent with such a reading because it refers to "leasing" particular

---

[1] (*See also id.*, at 4, ¶ 14 (emphasis omitted)):

The following is an examiner's statement of reasons for allowance: the closest prior art, Herz et al. (US pat. 5,758,257, "Herz" hereafter) in view of Logan et al. (US pat. 5,721,827, "Logan" hereafter) does not teach or suggest at least one data storage section being reserved for advertising data storage.  Marsh et al. (US 6,876,974 B1) teaches this limitation, literally as, a designated portion of the storage device 206 having a predetermined memory capacity (e.g., 10 MB) which is specifically reserved for storage of advertisements at the time the client system software is installed.  This is done to assure there is sufficient space for advertising, to support the special email application taught by March [*sic*, Marsh] et al.  There is no basis upon which one of ordinary skill in the art would have found it obvious, at the time of the invention, to add this specialized teaching to those of Herz and Logan.

storage areas." *See* '090 Patent at 32:2–6. Also of note, the prosecution history includes e-mail correspondence between the Examiner and the patentee in which the Examiner stated: "Searching the claim is not easy because, *as I explained in the reasons for allowance*, the phrase, '[]reserved data storage section(s)' is commonly used in the prior art to mean something far broader than the instant inventor means." (Dkt. No. 42, Ex. Q, Oct. 3, 2013 e-mail from Champagne to Owens (p. 8 of 10 in Ex. Q) (emphasis added).) In the correspondence that followed, the patentee did not challenge the Examiner's interpretation of "reserved." (*See id.*, Ex. Q, at pp. 5–7 of 10.)

Defendants' proposed construction does not improperly re-introduce a limitation of "adapted specifically for storing only the specifically identified advertising data" because this language required that the memory must be unusable for any other purpose. (*Id.*, Ex. O, Oct. 21, 2009 Supplemental Amendment, at 14 (emphasis omitted).) That is, this language required that the *capability* of the particular memory be limited to storing only advertising data. Defendants' proposed construction, by contrast, is consistent with the patentee's statements that "the receiver *reserves* at least one of the plurality of storage sections *just for storing advertising data*." (*Id.*, Ex. B, June 17, 2009 Request for Reconsideration After Final, at 14 (emphasis added); *see id.* ("the programmable local receiver unit is configured or structured to limit access to at least one of the storage sections of the memory to just advertising data").) Plaintiff's reliance upon *ZiiLabs Inc. v. Samsung Electronics Co.*, for example, is therefore unpersuasive. *See* No. 2:14-CV-203, 2015 WL 3955997, at *33 (E.D. Tex. June 25, 2015) (rejecting proposal of language that had been added but then removed during prosecution).

Plaintiff has also argued that the reserved storage space is not "just for storing specifically identified advertising data," as Defendants have proposed, because the specification

discloses collecting customer profile data. *See, e.g.,* '090 Patent at 31:56–60 & 32:28–48. Plaintiff has not shown, however, that such data must be stored in a "reserved advertising data storage section" rather than in some other location. Thus, Plaintiff has not demonstrated any inconsistency between Defendants' proposal and the disclosures regarding customer profile data. Moreover, to whatever extent this amounts to an argument as to what types of data are "advertising data,"[2] any underlying dispute as to the scope of "advertising data" has not been presented as a matter for claim construction as to these disputed terms.

On balance, the patentee's consistent statements during prosecution should be given effect such that the disputed terms refer to storage sections set aside just for storing advertising data. *See, e.g., Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent."); *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

Plaintiff's alternative suggestion of "allocated" rather than "set aside just for" (*see* Dkt. No. 45, at 3) does not appear to give proper effect to the patentee's above-discussed reliance, during prosecution, upon exclusivity as to a specific storage area. Also, whereas Plaintiff argued at the February 2, 2017 hearing that the storage is "reserved" for advertising data so long as an advertiser has control over what is stored there, the disputed terms refer to "advertising data," not "advertiser's data," so the term "reserved" must be given effect with respect to "advertising data."

---

[2] (*See, e.g.*, Dkt. No. 45, at 2 (Plaintiff referring to "various types of advertising data like ad queues, ads in any format, and ad statistics").)

Further, Plaintiff appeared to argue at the February 2, 2017 hearing that whereas advertising data can be stored only in a storage area that is "reserved" for advertising data, other data can be stored anywhere, including in areas that are "reserved" for advertising data. Plaintiff's argument appears to turn the patentee's consistent usage of "reserved" on its head by *restricting* the availability of storage for advertising data rather than *ensuring* it. Such an interpretation is inconsistent with the above-discussed intrinsic evidence and is therefore hereby expressly rejected. Also, although Plaintiff argued at the February 2, 2017 hearing that advertising data could merely be given *priority* for use of "reserved" storage areas, the patentee distinguished mere prioritization when distinguishing the "Travaille" reference during prosecution. (*See* Dkt. No. 42, Ex. M, Dec. 9, 2008 Amendment, at 15–16 (arguing that the applicant's "advertising storage section" "provides for specifically dedicating a section of the memory for storage of advertising data as opposed to other programming data, regardless of whether or not the other programming data may have a higher priority in some priority scheme").)

Nonetheless, to whatever extent Defendants are proposing that the "reserved" memory must be on a physically separate device or on a physically contiguous portion of a storage medium, no such limitation has been shown.

Finally, Plaintiff has argued that Defendants' proposal of the same construction for all of Claims 1, 4, and 8 is improper because Claims 4 and 8 of the '090 Patent do not recite "specifically identified" advertising data. The Court rejects Plaintiff's argument as follows. Claim 8 depends from Claim 5, which in turn depends from Claim 1. Further, Claim 8 itself recites "specifically identified advertising data." In a similar fashion, Claim 4 depends from Claim 3, which in turn depends from Claim 1. Claim 4 recites "customer specific advertising

- 17 -

data," and Claim 3 recites that "the specifically identified advertising data is customer specific advertising data." Defendants' proposal of "specifically identified" is therefore appropriate as to the disputed term in all of Claims 1, 4, and 8.

The Court therefore hereby construes **"individually controlled and reserved advertising data storage section adapted specifically for storing the specifically identified advertising data"** and **"individually controlled and reserved advertising data storage section"** to mean **"individually controlled data storage section set aside just for storing the specifically identified advertising data."**

**B. "addressable and reserved storage space[s] for storing digital advertising data" / "addressable and reserved storage space for storing the particular advertising data"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "individually controlled data storage section set aside just for storing specifically identified advertising data" |

(Dkt. No. 35, Ex. A, at 9; Dkt. No. 42, at 11; Dkt. No. 44, Ex. A, at 10–12.) The parties submit that these terms appear in Claims 1, 19, and 33 of the '494 Patent. (Dkt. No. 35, Ex. A, at 9; Dkt. No. 44, Ex. A, at 10.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary constructions: "addressable and reserved storage space[s] for storing digital advertising data" means "data storage section set aside just for storing digital advertising data"; and "addressable and reserved storage space for storing the particular advertising data" means "data storage section set aside just for storing the particular advertising data."

In their briefing as well as at the February 2, 2017 hearing, the parties referred to their arguments as to the "individually controlled and reserved advertising data storage section" terms,

which are addressed above.  (*See* Dkt. No. 36, at 10; *see also* Dkt. No. 42, at 11; Dkt. No. 45, at 1–3.)

The Court therefore reaches the same conclusions here as for the "individually controlled and reserved advertising data storage section" terms addressed above.  The Court accordingly hereby construes the disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"addressable and reserved storage space[s] for storing digital advertising data"** | **"data storage section set aside just for storing digital advertising data"** |
| **"addressable and reserved storage space for storing the particular advertising data"** | **"data storage section set aside just for storing the particular advertising data"** |

## C.  "customer specific advertising data"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "promotional content consisting of at least two media types that is targeted for consumption by a specific customer or end user by a particular identifier or selection code" |

(Dkt. No. 35, Ex. A, at 4; Dkt. No. 42, at 11; Dkt. No. 44, Ex. A, at 3–6.)  The parties submit that this term appears in Claims 3–5, 17, and 23 of the '090 Patent.  (Dkt. No. 35, Ex. A, at 4; Dkt. No. 44, Ex. A, at 3.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "promotional content that is targeted for consumption by a specific customer or a specific group of customers."

(1)  The Parties' Positions

Plaintiff argues that Defendants' proposal should be rejected because: (1) "[Defendants] replace[] 'advertising data' with 'promotional content,' a phrase found nowhere in the patent";

- 19 -

(2) Defendants' proposal to limit "advertising data" to content "consisting of at least two media types" is inconsistent with claim differentiation as to dependent Claims 98 and 102; and

(3) "[t]here is nothing in the specification or the claims requiring that 'a particular identifier or selection code' be used to pair advertising data to customers." (Dkt. No. 36, at 11–12.) Finally, Plaintiff urges that "to the extent that [Defendants] argue[] that 'customer specific' is limited to content created for a *single* customer, the specification offers no support for such a limitation." (*Id.*, at 12.)

Defendants respond that "advertising data means the advertisements, not simply data regarding the advertisement," and "'customer specific' means that the advertising data is targeted for consumption by a specific end user customer." (Dkt. No. 42, at 12.)

Plaintiff replies by reiterating that "the specification discloses various types of advertising data (both advertisements and data associated with advertising)." (Dkt. No. 45, at 4.)

At the February 2, 2017 hearing, Plaintiff argued that "customer specific advertising data" may include suitability criteria and therefore is not limited to only the promotional content itself.

(2)  Analysis

Claim 3 of the '090 Patent, for example, depends from Claim 1 and recites:

3.  The system of claim 1, wherein the specifically identified advertising data is customer specific advertising data and the customer specific advertising data is recorded in raw form by said programmable local receiver unit and subsequently processed or edited by a content filter according to preprogrammed user suitability criteria.

Defendants' proposal of "promotional content" properly clarifies that the phrase "advertising data" in the disputed term does not refer merely to any data related to advertising but rather refers to actual advertising content.  This interpretation is consistent with the context

provided by surrounding claim language in above-reproduced Claim 3, which recites that the data is "recorded in raw form" and "processed or edited by a content filter according to preprogrammed user suitability criteria."  Also, the parties have cited the following statements by the Examiner in a section titled "Interpretation of Claim Language":

> 8.  Advertising data is disclosed (spec. para. [0173] and [0186]) to be promotional information provided in a special way ("targeted" or "specifically identified") *for consumption by the end user*.  Here, by definition, advertising data is the information placed in one or more reserved storage sections.  Advertising data is functional descriptive material and accordingly given patentable weight (MPEP 211.051.A).

(Dkt. No. 42, Ex. A, July 10, 2013 Notice of Allowability, at 3 (emphasis modified).)  Although Plaintiff argues that this reference to "promotional information" demonstrates that "advertising data" need not be actual advertisements (Dkt. No. 45, at 4), the subsequent phrase "for consumption by the end user" undermines Plaintiff's interpretation of the Examiner's statements.

As to Defendants' proposal of requiring "at least two media types," no such limitation is evident in the claim language or in any definition or disclaimer in the intrinsic evidence.

Also, Defendants have not shown that customer specific advertising data cannot include data that is associated with the promotional content, such as control information that may be necessary for proper storage and playback of promotional content.  Further, Defendants have not shown that any claim language or any definition or disclaimer requires an "identifier or selection code."

Finally, Defendants have not demonstrated that "customer specific" means that an advertisement is targeted at a particular end user.  On one hand, the specification discloses that "advertisements which are delivered to the VPR/DMS 30 advertising 'sections' can be customer specific by use of systems built-in signal decoding and the data content filter/editing algorithm."  '090 Patent at 32:7–10.  More specifically, the specification discloses:

This customized editing feature allows *each member of a family* to enjoy a customized edition of the broadcast program/movie according to their own *personal preferences*, or those of the VPR/DMS system administrator. This functionality gives parents greater control over content to be viewed by their children. It also provides many new opportunities for broadcasters and content providers to transmit various editions of custom programs and custom targeted advertising data all contained within a single broadcast transmission.

*Id.* at 30:29–38 (emphasis added).

On the other hand, the specification suggests that advertising may be targeted for groups rather than for one particular end user:

The designated advertising "sections" might be used for delivering advertising feeds, which are processed and recorded by VPR/DMS 30 system for real-time or subsequent viewing by end user. These advertising data feeds might be *mass distributed* or broadcast to VPR/DMS 30 customers, or might be selectively distributed according to *customer profiles, demographics, or other criteria.*

*Id.* at 31:49–56 (emphasis added); *see id.* at 32:54–57 ("Providing the advertiser has immediately available advertisement formats (audio/video/text, etc.) for transmission, then instantaneous advertisement delivery can be transmitted to the *5,000,000 qualified customers*.") (emphasis added).

The Court therefore hereby construes **"customer specific advertising data"** to mean **"promotional content (and associated data, if any) that is targeted for consumption by a specific customer or a specific group of customers."**

**D. "user suitability criteria"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "content-based filter preferences set by the user, such as a program name, theme, genre, favorite actors or actresses, directors, producers or other parameters, such as key words, television/motion picture rating" |

(Dkt. No. 35, Ex. A, at 6; Dkt. No. 42, at 12; Dkt. No. 44, Ex. A, at 6–7.)  The parties submit that this term appears in Claims 3 and 23 of the '090 Patent.  (Dkt. No. 35, Ex. A, at 6; Dkt. No. 44, Ex. A, at 6.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposed list of examples."

(1)  The Parties' Positions

Plaintiff argues that "[Defendants] propose[] to impermissibly limit this term to specific examples from the specification . . . ."  (Dkt. No. 36, at 12.)

Defendants respond that they "propose[] a construction based on express statements in the specification."  (Dkt. No. 42, at 12–13.)

Plaintiff replies that Defendants "seek[] to impermissibly limit the term to an exemplary list in a preferred embodiment."  (Dkt. No. 45, at 4–5.)  Plaintiff submits: "[Defendants] argue[] that [they are] only attempting to provide exemplary guidance to the jury as opposed to a construction that defines the scope of the term by limiting it to those criteria; that, of course, is *not* the function of claim construction, and the risk of jury confusion is too great."  (*Id.*, at 5.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

(2)  Analysis

The specification discloses:

[T]he preferred embodiment makes significant improvements over the manual timer or VCR+ type recording methods by allowing the user to personalize his or her own parameters for recording broadcast programs. . . . [T]he system includes a built-in automatic discretionary content filter/editor.  This content filter/editor allows a user to program the unit to automatically record broadcast content by selection of a "User Suitability Criteria", which may be defined as a program

name, theme, genre, favorite actors or actresses, directors, producers or other
parameters, such as key words, television/motion picture rating, etc. The User
Suitability Criteria may be used alone or in combination, and can be used to either
select or prohibit programming to be recorded.

'090 Patent at 5:51–65.

Although the specification thus sets forth the examples that Defendants have included in

their proposed construction, this list is disclosed merely as how "'User Suitability Criteria' . . .

*may be* defined . . . ." *Id.* (emphasis added). Any benefit of including this list of examples in the

construction is outweighed by the risk that the finder of fact might perceive this list as limiting.

The examples therefore should not be included in the construction.

Further, Defendants have not shown why the criteria must necessarily be set "by the

user" rather than in some other manner. No such limitation is apparent in the claim language,

and Defendants have not shown any definition or disclaimer in this regard.

Finally, Defendants propose that the criteria must be "content-based." The specification

discloses:

In a preferred embodiment, the user may program the system to process the
received data according to the User's Suitability Criteria. For example, the
system may be preset to automatically filter, edit, record or not record all or any
part of the *content* of the data based on User's Suitability Criteria, by interpreting
control data encoded into a broadcast signal.

*Id.* at 8:18–23 (emphasis added). Nonetheless, the above-quoted disclosure of "other parameters,

such as key words, television/motion picture rating, etc.," weighs against imposing a "content-

based" limitation. *See id.* at 5:51–65. For example, the specification discloses that entire

programs could be categorically blocked. *See id.* at 8:26–52 ("The V-chip, which is well known,

merely blocks out entire programs that are considered 'unsuitable.'"). Also of note, the

specification refers to user suitability criteria in the context of age. *See id.* at 9:50–64 ("For

example, this feature allows parents to have greater control over the programming that may be accessed by their children.").

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court therefore hereby construes **"user suitability criteria"** to have its **plain meaning**.

**E. "automatically"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "without human intervention" |

(Dkt. No. 35, Ex. A, at 7 & 12.) The parties submit that this term appears in Claims 1, 5, and 6 of the '090 Patent and Claims 3 and 43 of the '494 Patent. (Dkt. No. 35, Ex. A, at 7 & 12.)

Defendants submit that "[t]he parties have agreed to plain meaning" for this term. (Dkt. No. 42, at 1 n.1.)

Because this term is no longer disputed, the Court does not further address this term.

**F. "multimedia data products"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "content consisting of at least two media types such as video, audio, images, or text" |

(Dkt. No. 35, Ex. A, at 6; Dkt. No. 42, at 14; Dkt. No. 44, Ex. A, at 7–9.)  The parties submit that this term appears in Claims 1 and 2 of the '090 Patent.  (Dkt. No. 35, Ex. A, at 6; Dkt. No. 44, Ex. A, at 7.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "'content consisting of at least two media types (examples of media types may include video, audio, images, or text)' (reject Defendants' argument that a downloaded broadcast program cannot be a 'multimedia data product')."

(1)  The Parties' Positions

Plaintiff argues: "While multimedia could certainly include media types such as video, audio, images, or text, providing a limited 'such as' list is confusing to the jury and would tend to create an exhausted list rather than an opened ended exemplary one.  Additionally, the patent discloses downloaded broadcast programs over cable or satellite as being a multimedia data product."  (Dkt. No. 36, at 16.)

Defendants respond that they intend their proposal to "simplify the terms by providing concrete examples for an otherwise abstract concept to avoid any confusion to the jury."  (Dkt. No. 42, at 14.)  Defendants also urge that "[t]he specification . . . does not support 'downloaded broadcast programs' as multimedia data products as argued by [Plaintiff]."  (*Id.*)

Plaintiff replies that "[o]riginal Claim 2 of the '090 Patent is part of the specification and states that 'multimedia data products are received via Network TV broadcast, Cable TV broadcast, or Satellite broadcast.'"  (Dkt. No. 45, at 5.)

At the February 2, 2017 hearing, Plaintiff argued that Defendants' proposal should be rejected because, in patent parlance, the word "consisting" is a closed-ended term that excludes anything other than what is set forth.  Plaintiff proposed that "including" would be a more appropriate term.

(2)  Analysis

The specification does not define "multimedia" but rather merely discloses that "information may . . . be blended into a Multimedia Data Display/Playback 65, for the user's discretionary enjoyment."  '090 Patent at 29:1–3; *see id.* at Fig. 9 (illustrating reference numeral 65 as "BLENDED Multimedia Data Display/Playback").  The specification also refers to a "multimedia array of sports programming."  *Id.* at 20:24–31 ("The processing means 13 may include any or all of the features and attributes as described hereinabove.  In this manner, the user, through user interface 17 and microprocessor 12, may specify the exact type of processing he/she wishes the received raw data in the form of a movie to undergo.  Using the example of the *multimedia array of sports programming*, the digital information would pass from the storage device 14 to the playback device.") (emphasis added).

The specification thus appears to contemplate audio/video program broadcasts as a typical example of multimedia data products.  *See also id.* at 1:51–53 ("program broadcasts such as network television, radio, cable television channels[,] satellite feeds, UHF/VHF channels, videotapes, and even the Internet"); *id.* at 26:29–30 ("Broadcast program data (e.g., television audio and video signals) are received on data feed 10a at the receiver 2.").  The Court therefore

hereby expressly rejects Defendants' argument that a downloaded broadcast program cannot be a "multimedia data product."

In order to give effect to the term "*multi*media," however, Defendants' proposal of requiring "content consisting of at least two media types" is appropriate. Further, providing a non-exclusive list of examples will assist the finder of fact and will prevent or mitigate confusion as to the meaning of "media types." *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").

The Court accordingly hereby construes **"multimedia data products"** to mean **"content including at least two media types (examples of media types may include video, audio, images, or text)."**

## G. "digital multimedia data"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "digital content consisting of at least two media types such as video, audio, images, or text" |

(Dkt. No. 35, Ex. A, at 12; Dkt. No. 42, at 14; Dkt. No. 44, Ex. A, at 13.) The parties submit that this term appears in Claims 19 and 33 of the '494 Patent. (Dkt. No. 35, Ex. A, at 12.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "digital content consisting of at least two media types (examples of media types may include video, audio, images, or text)."

Plaintiff argues that "[Defendants'] proposal does nothing other than add 'digital' to its proposed construction for multimedia data product, and thus is nothing other than an attempt to define multimedia twice."  (Dkt. No. 36, at 16.)

Defendants respond (and Plaintiff replies) as to this term together with the term "multimedia data products," which is addressed above.  (*See* Dkt. No. 42, at 14; *see also* Dkt. No. 45, at 5–6.)  The parties likewise addressed all of these terms together at the February 2, 2017 hearing.

(2)  Analysis

The Court reaches the same conclusions for this term as for the similar term "multimedia data products," which is addressed above.

The Court therefore hereby construes **"digital multimedia data"** to mean **"digital content including at least two media types (examples of media types may include video, audio, images, or text)."**

## H.  "the suitability criteria data is collected by at least one method selected from the group consisting of . . ."

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning"<br><br>Not subject to §112(6). | Indefinite |

(Dkt. No. 35, Ex. A, at 13; Dkt. No. 44, Ex. A, at 14–16.)  The parties submit that this term appears in Claims 5, 25, and 39 of the '494 Patent.  (Dkt. No. 35, Ex. A, at 13; Dkt. No. 44, Ex. A, at 14.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' argument that these claims are improper mixed method-apparatus claims)."

<u>(1)  The Parties' Positions</u>

Plaintiff submits that "[Defendants] simply label[] this term indefinite without explanation or support from any expert."  (Dkt. No. 36, at 16.)

Defendants respond that "Claims 5, 25, and 39 of the '494 Patent impermissibly introduce method steps into system claims."  (Dkt. No. 42, at 15.)

Plaintiff replies that "[t]hese functional limitations do not create ambiguity as to when infringement may occur but rather define the functionality that must be present for infringement."  (Dkt. No. 45, at 6.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

<u>(2)  Analysis</u>

A single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class.  *IPXL Holdings*[*, LLC v. Amazon.com, Inc.*], 430 F.3d [1377,] 1384 [(Fed. Cir. 2005)] (holding indefinite a claim covering both an apparatus and a method of using that apparatus).

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008).

Claims 1 and 5 of the '494 Patent, for example, recite:

1.  A system for providing targeted advertising to a multimedia content end user, comprising:
    at least one storage device, wherein at least one of said at least one storage device comprises at least one addressable and reserved storage space for storing digital advertising data;
    at least one processor; and

- 30 -

software implemented by said at least one processor wherein said software comprises a program to reserve said at least one addressable storage space and wherein said software further comprises a program to select particular advertising data suitable for targeting to at least one end user based upon predefined criteria data, wherein particular advertising data is stored in said at least one addressable and reserved storage space and is accessible to the at least one end user.

\* \* \*

5.  The system of claim 1, wherein the suitability criteria data is collected by at least one method selected from the group consisting of monitoring at least one activity of an end user, monitoring a search routine of an end user, monitoring a key word, monitoring an end user inquiry, monitoring a selection of media content by an end user, monitoring a selection of television programming by an end user, monitoring playback of a media program, monitoring an advertising preference of an end user, monitoring a product rental or purchase by an end user, monitoring a broadcast time schedule, examining end user profile data, examining demographics, and combinations thereof.

Defendants have cited *UltimatePointer, LLC v. Nintendo Co., Ltd.*, which found a "pointing device" claim to be invalid because the claim also "requir[ed] the user to use the pointing device." No. 6:11-CV-496, 2013 WL 2325118 (E.D. Tex. May 28, 2013). Likewise, Defendants have cited *Ariba, Inc. v. Emptoris, Inc.*, which found an improper mixed method-apparatus claim where the claim recited "[a] bidding device" but also recited "wherein a bid submitted by the potential seller operating the bidding device is compared to the corresponding bid ceiling of the potential seller operating the bidding device," and this "compar[ing]" did not occur on the bidding device. No. 9:07-CV-90, 2008 WL 3482521 (E.D. Tex. Aug. 7, 2008), *aff'd*, No. 2009-1230, 2010 WL 55625 (Fed. Cir. Jan. 8, 2010).

Claims 1 and 5 of the '494 Patent, by contrast, recite a "system." Particularly because above-reproduced Claim 1 recites a "processor" and "software" configured so as to perform various functions, dependent Claim 5 merely recites an additional configuration limitation rather than requiring the actual performance of any method step. *See Microprocessor Enhancement*, 520 F.3d at 1375 (noting that "functional language" is permissible in claims); *see also Typhoon*

*Touch*, 659 F.3d at 1381–82 ("We discern no error in the district court's view that this term requires that the device is programmed or configured to perform the stated function.").

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. No further construction is necessary.

The Court accordingly hereby construes **"the suitability criteria data is collected by at least one method selected from the group consisting of . . ."** to have its **plain meaning**.

**I. "the particular advertising data is configured for presentation to an end user by a method selected from the group consisting of . . ."**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning"<br><br>Not subject to §112(6). | Indefinite |

(Dkt. No. 35, Ex. A, at 13–14.) The parties submit that this term appears in Claim 28 of the '494 Patent. (Dkt. No. 35, Ex. A, at 13–14.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' argument that this claim is an improper mixed method-apparatus claim)."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[Defendants] simply label[] this term indefinite without explanation or support from any expert." (Dkt. No. 36, at 16.)

Defendants respond that "dependent claim 28 recites the method step 'the particular advertising data is configured for presentation to an end user by a method selected from the group consisting of . . . ,' which may be performed by a user. Furthermore, the apparatus step is not limited to the elements of the system. The claim as read in light of the specification provides no guidance as to who or what performs the step." (Dkt. No. 42, at 17.)

Plaintiff's reply brief does not address this term. (*See* Dkt. No. 45.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

(2)  Analysis

Claims 19 and 28 of the '494 Patent recite (emphasis added):

19.  A device for providing targeted advertising to an end user, comprising:
>    at least one input port for receiving digital multimedia data, wherein the digital multimedia data comprises particular advertising data for targeting to at least one end user based upon predefined criteria data associated with the at least one end user;
>    at least one storage device;
>    at least one addressable and reserved storage space for storing the particular advertising data;
>    at least one processor configured to reserve said at least one addressable storage space and to present the particular advertising data to the at least one end user.

* * *

28.  The device of claim 19, wherein the particular advertising data *is configured* for presentation to an end user by a method selected from the group consisting of a dynamic insertion of the particular advertising data in or around a user selected media program, a transfer of the particular advertising data to a second end user device, a menu screen, a header, a footer, an [*sic*, a] picture in picture, a split screen, an overlay, a keyword search item, a user selectable interactive advertisement, and combinations thereof.

Claim 28 thus recites a limitation as to how the advertising data "is configured."  This configuration limitation does not amount to introducing a method step.  *See Microprocessor Enhancement*, 520 F.3d at 1375 (noting that "functional language" is permissible in claims); *see also Typhoon Touch*, 659 F.3d at 1381–82 ("We discern no error in the district court's view that this term requires that the device is programmed or configured to perform the stated function.").

The Court therefore hereby expressly rejects Defendants' indefiniteness argument.  No further construction is necessary.

The Court accordingly hereby construes **"the particular advertising data is configured for presentation to an end user by a method selected from the group consisting of"** to have its **plain meaning**.

## V. DISPUTED TERMS IN U.S. PATENTS NO. 7,840,437 AND 8,955,029

### J. "limited-use digital data"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "plain meaning" | "rented digital data" |

(Dkt. No. 35, Ex. A, at 23; Dkt. No. 42, at 23; Dkt. No. 44, Ex. A, at 47–60.) The parties submit that this term appears in Claims 1–4, 6–9, 13–15, 19, 20, 22, 25–28, 30, 31, and 68 of the '029 Patent. (Dkt. No. 35, Ex. A, at 23; Dkt. No. 44, Ex. A, at 47.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposal that 'limited-use' means 'rented')."

<u>(1) The Parties' Positions</u>

Plaintiff argues that Defendants' proposed construction should be rejected because "the claims themselves distinguish 'limited-use digital data' from 'rented digital data.'" (Dkt. No. 36, at 18.)

Defendants respond that whereas Plaintiff's proposal amounts to expanding the term "to cover some unknown scope of data," Defendants' proposal "is consistent with the plain language of the claim and the specification." (Dkt. No. 42, at 23.) Defendants also argue that Claim 68 of the '029 Patent uses "rented digital data" and "limited-use digital data" interchangeably. (*Id.*, at 24 (citing *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("The interchangeable use of . . . two terms is akin to a definition equating the two.")).)

Plaintiff replies that "[c]ontrary to the assertions by [Defendants], the specification discusses a wide variety of data that may be obtained without rental." (Dkt. No. 45, at 6.) Plaintiff argues that "while all rented data will be considered limited-use data (subject to restrictions), not all limited-use data will be rented." (*Id.*, at 7.)

At the February 2, 2017 hearing, Plaintiff argued that the specification discloses restrictions and limited uses other than rentals, such as previews and demos.

(2) Analysis

On one hand, "[c]laims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) (citations omitted). Likewise, "it is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).

On the other hand, Plaintiff has highlighted that whereas Claim 1 of the '029 Patent recites "limited-use digital data," Claim 68 of the '029 Patent recites "rented digital data." *See Tandon Corp. v. U.S. Intern. Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."); *see also CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (noting "[t]he general presumption that different terms have different meanings").

Defendants have emphasized that the specification refers to "rental (limited use)":

A variation of the invention offers content providers the capability of direct instant delivering [*sic*] multi-formatted programs (movies, direct Compact Disc or

other audio medium, video catalogs, etc.). The data management zone (or ring) would allow for *rental (limited use)* or purchase to home based or business based customers. It effectively eliminates need for transporting, inventorying, and physical delivery of digital data products. Direct data rental or purchase provides far more convenience, data security, versatility, cost effectiveness, technical quality, accessibility, product variety, product durability (no broken tapes or damaged compact discs)[,] anti-piracy protection, various preview/rental/purchase options, secure transactions, auto return (no late fees), user privacy, etc. It also provides the added benefit to the rental industry of reducing or eliminating retail space and physical inventory.

'029 Patent at 7:9–24 (emphasis added). Even assuming for the sake of argument that this disclosure of "rental (limited use)" means that a "rental" is a "limited use," Defendants have not shown that it necessarily follows that "limited use" means *only* "rental." Instead, a better reading of the above-reproduced disclosure is that "rental" is an example of "limited use." *See id.*; *see also id.* at 36:3-6 ("the system is programmable to automatically return, erase, scramble or block out the data/program when the rental, preview, demo time has expired"). The same is true as to the recital in Claim 68 of both "rented digital data" and "limited-use digital data."

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"limited-use digital data"** to have its **plain meaning**.

### K. "data supplier"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "data product supplier, e.g. movie studios, distributors, sports broadcasters, network and cable broadcasters, news media outlets, music publishers, and book distributors" |

(Dkt. No. 35, Ex. A, at 21; Dkt. No. 42, at 17; Dkt. No. 44, Ex. A, at 25–35.)  The parties submit that this term appears in Claims 1, 8, 9, 19, 21, 22, 25, 31, 36, 53, 58, 64, 68, 70, 79, and 82 of the '029 Patent.  (Dkt. No. 35, Ex. A, at 21; Dkt. No. 44, Ex. A, at 25.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposal of 'product' as well as Defendants' proposed list of examples)."

(1)  The Parties' Positions

Plaintiff argues that "[w]hile data suppliers could certainly include 'movie studios, distributors, sports broadcasters, network and cable broadcasters, news media outlets, music publishers, and book distributors,' as stated in [Defendants'] proposed construction, providing a limited 'e.g.' list is confusing to the jury and would tend to suggest an exhausted list rather than an exemplary one."  (Dkt. No. 36, at 19.)

Defendants respond that "[t]he term must be read in light of the specification which only supports content providers as 'data suppliers.'"  (Dkt. No. 42, at 18.)  Defendants argue that a "satellite provider may receive the movie from the broadcast network but is not a 'data supplier' (such as HBO) within the meaning of the specification."  (*Id.* (discussing '029 Patent at 44:29–35).)

Plaintiff replies: "The claims require that the data supplier be allowed to monitor and receive notifications and communications concerning the use of the supplied data.  Any entity that is responsible for supplying data to the end user is thus covered by these claims."  (Dkt. No. 45, at 7.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

<u>(2) Analysis</u>

The specification discloses:

> The Content Providers 41 may consist of movie studios, distributors, sports broadcasters, network and cable broadcasters, news media outlets, music publishers, book distributors, and generally any content providers that would otherwise utilize the television, personal computer, the internet, or telephone lines to convey information.
>
> * * *
>
> This VPR/DMS 30 comprises a built-in non-movable storage device 14 which has certain areas that are reserved and controlled by the cable company. These areas are available for commercial sales or leasing to others, who may include movie distributors, advertisers, data product suppliers, video game suppliers, video magazine publishers, or video product catalogue companies.

'029 Patent at 21:21–26 & 32:22–28.

Although the specification thus sets forth examples that Defendants have included in their proposed construction, Defendants have not shown that the examples necessarily pertain to the term "data supplier." In addition, Defendants have not shown that including their proposed list of examples in the construction is necessary or that any benefit would outweigh the risk that the finder of fact might perceive the list as limiting. On balance, the examples proposed by Defendants should not be included in the construction.

Defendants also have not adequately justified their proposal of requiring that a "data supplier" must be a "data *product* supplier." *See id.* at 32:24–28 ("data product suppliers"). Instead, "data product suppliers" simply appear to be one potential type of "data supplier." *See id.* at 32:22–28.

Finally, Defendants have not shown that the term "data supplier" refers only to entities that generate content as opposed to, for example, distribution network providers. No such limitation is apparent in the claim language, and Defendants have not shown that the intrinsic

evidence contains any relevant definition or disclaimer.  Also of note, the specification refers to

"premium channel broadcast network[s] such as Direct TV, HBO, or SHOWTIME . . . ."  *Id.*

at 44:29–30.  This reference to "Direct TV," which the parties appear to agree is a reference to a

satellite television provider (*see* Dkt. No. 36, at 19; *see also* Dkt. No. 42, at 18), further weighs

against limiting "data supplier" to content generators as opposed to distributors.

The Court therefore hereby expressly rejects Defendants' proposed construction.  No

further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521

F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d

at 1291.

The Court accordingly hereby construes **"data supplier"** to have its **plain meaning**.

**L.  "notifying a data supplier of said simulated return"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "communicating the simulated return of the rented data to the data product supplier, e.g. movie studios, distributors, sports broadcasters, network and cable broadcasters, news media outlets, music publishers, and book distributors" |

(Dkt. No. 35, Ex. A, at 15; Dkt. No. 42, at 18–19; Dkt. No. 44, Ex. A, at 17.)  The parties submit

that this term appears in Claim 1 of the '437 Patent.  (Dkt. No. 35, Ex. A, at 15; Dkt. No. 44,

Ex. A, at 17.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties

with the following preliminary construction: "communicating to the data supplier the simulated

return of the rented data."

Plaintiff argues that "there is no reason to substitute the term 'notifying' for 'communicating,'" and "[c]ommunication may infer a specific type of action or message being sent that is not required in the claim."  (Dkt. No. 36, at 19.)

Defendants respond that their proposal is consistent with the prosecution history.  (Dkt. No. 42, at 19.)

Plaintiff replies as to this term together with the term "data supplier," which is addressed above.  (Dkt. No. 45, at 7.)

At the February 2, 2017 hearing, Plaintiff expressed concern that "communicating" might carry more restrictive connotations than "notifying."  In particular, Plaintiff suggested that "communicating" might be interpreted as requiring two-way communication.  Defendants responded that they are not arguing that the communication must be two-way.  Instead, Defendants argued, this disputed term simply requires a communication back to the data supplier.

(2)  Analysis

On one hand, the specification discloses an example that includes "notifying the digital data provider that the transaction is completed":

> Virtual Video Game rental is operationally the same as the Virtual Movie Rental, except the data is video game data (e.g., SONY PLAYSTATION, NINTENDO 64).  Data is stored on built-in storage device 14, and output from digital output to re-writeable adapter cartridge, which may be inserted into a game console.  A return is initiated by deleting the rented software from the built-in storage device 14 and *notifying* the digital data provider that the transaction is completed.

'437 Patent at 38:30–37 (emphasis added).

On the other hand, the specification also refers to "communicat[ing]," "negotiat[ing]," and "signal[ing]." *Id.* at 17:31–36 ("unless the downloaded movie is erased (and such erasure communicated back to the microprocessor 12), 'late fees' could be assessed"), 35:52–67 ("[t]he VPR/DMS interfaces with the ATS to negotiate the 'return'") & 38:20–25 ("the micro-controller 31 signals the remote ATS 29 that the movie data has been properly erased").

Further, during prosecution, the patentee explained that "[i]f the user decides from the menu of options to return the rental, then the user has to take action to return the rental and the return is *communicated* to the data provider." (Dkt. No. 42, Ex. T, Mar. 16, 2009 Response to Requirement for Election and Amendment, at 13 (emphasis added).) The patentee distinguished the "Tsukamoto et al." reference, arguing that "applicant teaches that the simulated or virtual return *with notice to the data provider* is an alternate to the automatic return such as provided by Tsukamoto et al. . . . ." (*Id.* (emphasis added).)

The specification and the prosecution history are thus consistent with Defendants' proposal that the disputed term requires communication. *See Typhoon Touch*, 659 F.3d at 1381 ("The patentee is bound by representations made and actions that were taken in order to obtain the patent."); *see also Springs Window*, 323 F.3d at 995 ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

The Court therefore hereby construes **"notifying a data supplier of said simulated return"** to mean **"communicating to the data supplier the simulated return of the rented data."**

## M.  "enacting a simulated return of said rented data"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "making said rented data inaccessible to the user of the storage device" |

(Dkt. No. 35, Ex. A, at 16; Dkt. No. 42, at 19; Dkt. No. 44, Ex. A, at 18–20.)  The parties submit that this term appears in Claims 1 and 13 of the '437 Patent.  (Dkt. No. 35, Ex. A, at 16; Dkt. No. 44, Ex. A, at 18.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (Expressly reject Defendants' proposed construction)."

(1)  The Parties' Positions

Plaintiff argues that "[t]he claim itself defines what is meant by 'enacting a simulated return . . .' by stating a simulated return is accomplished 'by deleting or scrambling said data from said built in storage device or blocking further access to said data.'"  (Dkt. No. 36, at 20 (quoting "'437 Patent at 36:34–37 [*sic*, 46:34–37]").)  Plaintiff also argues that "[Defendants] incorrectly focus[] on access to the data when the claim refers to use of the data."  (Dkt. No. 36, at 20.)

Defendants respond that "[a] jury would not readily ascertain the meaning of this term" because "[i]t is unclear from the claim term itself what a 'return' is at all, much less a 'simulated return.'"  (Dkt. No. 42, at 19–20.)

Plaintiff replies that Defendants' proposal of "inaccessibly" is contrary to disclosures in the specification that a return can be performed by encrypting or scrambling data, and "[e]ncrypted and scrambled data is still accessible to potentially be decrypted or unscrambled at

a later time." (Dkt. No. 45, at 7–8.) Plaintiff reiterates that "[i]f data can be made available in the future, then it must be accessible." (*Id.*, at 8.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

<u>(2)  Analysis</u>

The specification discloses, for example:

> In order to avoid late charges or fees for rental transactions, the user must "return" the data product by selecting a return option from the electronic menu.  The VPR/DMS interfaces with the ATS to negotiate the "return", and the data product is erased from the VPR/DMS storage device or re-scrambled (authorization key voided, where the data product remains stored for future access/rental/purchase). The data product has been transferred to portable medium; the control data keeps a record of such transfer, and requires the portable medium to be erased before successfully negotiating the "return."  In this way, the system is programmable by the end user and broadcaster/content provider to enact a "virtual return" of data products stored on the non-moveable storage device.

'437 Patent at 8:4–17.

The disputed term appears in Claims 1 and 13 of the '437 Patent.  Claim 1 of the '437 Patent recites, in relevant part (emphasis added): "enacting a simulated return of said rented data *by deleting or scrambling said data from said built in storage device or blocking further access to said data*."  Claim 13 of the '437 Patent depends from Claim 9, which in turn depends from Claim 1.  Claim 13 recites: "13.  The system of claim 9, wherein the enacting of the simulated return of said rented data by deleting or scrambling said data from said non-movable storage device or blocking further access to said data, additionally requires the deleting or scrambling of the rented data from said portable storage device on which the rented data has been recorded or blocking further access to said data."

Because surrounding claim language thus recites the manner of "enacting a simulated return of said rented data," no further construction is necessary.  *See U.S. Surgical*, 103 F.3d

at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court therefore hereby construes **"enacting a simulated return of said rented data"** to have its **plain meaning**.

**N. "performing a virtual return of the [limited-use / stored rented] digital data that has been transferred to the portable playback device"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "making said limited-use data inaccessible on the portable playback device and making the processing circuitry aware that the user of the portable playback device no longer has access"[3] |

(Dkt. No. 35, Ex. A, at 20; Dkt. No. 44, Ex. A, at 41–47.)  The parties submit that this term appears in Claims 1, 35, and 68 of the '029 Patent.  (Dkt. No. 35, Ex. A, at 20; Dkt. No. 44, Ex. A, at 41.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "'making said [limited-use / rented] data inaccessible on the portable playback device' (reject Defendants' proposal of 'making the processing circuitry aware that the user of the portable playback device no longer has access')."

---

[3] Defendants previously proposed: "making said [limited-use / rented] data inaccessible on the portable playback device and making the data product supplier, e.g. movie studios, distributors, sports broadcasters, network and cable broadcasters, news media outlets, music publishers, and book distributors, aware that the user of the portable playback device no longer has access to said [limited-use / rented] data."  (Dkt. No. 35, Ex. A, at 20.)  Defendants also previously proposed: "making said [limited-use / rented data] inaccessible on the portable playback device and making the processing circuitry aware that the portable playback device no longer has access."  (Dkt. No. 42, at 22.)

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[Defendants'] requirement of 'making the data supplier . . . aware' that the user no longer has access to the rented data is unsupported by the specification, which allows for an automatic return of rented data . . . ." (Dkt. No. 36, at 21.)

Defendants respond that construction is necessary because "[t]he claims do not make it apparent what a 'virtual return' is or how one would be performed, particularly in relation to material that has been transferred to portable playback devices." (Dkt. No. 42, at 22.)

Plaintiff replies as to this term together with the term "enacting a simulated return of said rented data," which is addressed above. (*See* Dkt. No. 45, at 7–8.)

At the February 2, 2017 hearing, Plaintiff urged that Defendants' proposal of "inaccessible" is inconsistent with disclosures in the specification that the data might not be deleted but rather could be kept on a device and might be accessed later if, for example, the user rents the same content again. Plaintiff suggested, as an alternative proposal, that Defendants' proposed construction should be modified by replacing "inaccessible" with "unplayable." Plaintiff also argued claim differentiation as to Claims 19 and 21 of the '029 Patent.

<u>(2) Analysis</u>

Claim 1 of the '029 Patent, for example, recites in relevant part (emphasis added): "wherein said processing circuitry further comprises a program for transferring to a portable playback device the stored limited-use digital data and control data for use by the portable playback device for *performing a virtual return of the limited-use digital data that has been transferred to the portable playback device*."

The specification discloses, for example:

> If a copy has been made for use on outside players, then the VPR/DMS 30 queries the user to insert a disc or tape into the portable medium player/recorder 19. The

micro-controller 31 reads the control data information on the disc to make sure that the disc is the proper one.  When this is confirmed, the programming in the VPR/DMS 30 causes the portable medium recorder/player 19 to *erase the disc or otherwise render it unusable*.  Next, the micro-controller 31 issues instructions to delete the movie data from the built-in digital storage device 14.  Finally, the micro-controller 31 signals the remote ATS 29 that the movie data has been properly erased from the built-in storage device 14, and any portable copies that may exist.

'029 Patent at 38:30–42 (emphasis added).

Based on this and other disclosures, Defendants' proposal of "inaccessible" gives proper effect to how the specification uses the phrase "virtual return."  *See id.*; *see also id.* at 8:6–14 ("The VPR/DMS interfaces with the ATS to negotiate the 'return', and the data product is *erased* from the VPR/DMS storage device *or re-scrambled* (authorization key voided, where the data product *remains stored for future access/rental/purchase*).  The data product has been transferred to portable medium: the control data keeps a record of such transfer, and requires the portable medium to be erased before successfully negotiating the 'return.'") (emphasis added); *id.* at 34:36–52 ("the user may enjoy access to the data product" and "[a]ccess would occur for a limited period if rented").

Nonetheless, as Plaintiff emphasized at the February 2, 2017 hearing, the data need merely be inaccessible *to the user* because the data might "remain[] stored for future access/rental/purchase" ('029 Patent at 8:6–10), such as if the user rents the same content again.

Further, Defendants have not shown that the claim language recites any limitation of "making the processing circuitry aware that the portable playback device no longer has access." Although the specification discloses that "unless the downloaded movie is erased (and such erasure communicated back to the microprocessor 12), 'late fees' could be assessed to the user until such rental was virtually 'returned'" (*id.* at 17:38–41), this is a specific feature of particular disclosed embodiments that is not required by the claims unless recited.  *See Phillips*, 415 F.3d

at 1323. Also of note, the specification discloses that a "'virtual return' may be an 'auto return', where the data is automatically erased at the expiration of the rental period." *Id.* at 38:17–19.

The Court therefore hereby construes **"performing a virtual return of the [limited-use / stored rented] digital data that has been transferred to the portable playback device"** to mean **"making said [limited-use / stored rented] data inaccessible to the user on the portable playback device."**

## O. "by deleting or scrambling said data from said built in storage device or blocking further access to said data"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "plain meaning" | "by only one of: (1) deleting; (2) scrambling said data from said built in storage device; and (3) blocking further access to said data" |

(Dkt. No. 35, Ex. A, at 18; Dkt. No. 42, at 20; Dkt. No. 44, Ex. A, at 20–22.) The parties submit that this term appears in Claims 1 and 13 of the '437 Patent. (Dkt. No. 35, Ex. A, at 18; Dkt. No. 44, Ex. A, at 20.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposal of 'only one of')."

(1) The Parties' Positions

Plaintiff argues that "[Defendants'] proposed construction should be rejected because it improperly limits these options by stating 'only one' can be utilized." (Dkt. No. 36, at 21–22.)

Defendants respond that "[Plaintiff's] assertion that the plain and ordinary meaning of the term provides an inclusive list . . . goes against the specification and the readily understood use of 'or' as linking alternatives." (Dkt. No. 42, at 21.)

Plaintiff replies that "[i]n the context of this patent, 'or' is conjunctive as it provides various alternatives to effect a simulated return." (Dkt. No. 45, at 8.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

(2) Analysis

The specification discloses, for example, that "the system is programmable to automatically return, erase, scramble or block out the data/program when the rental, preview, demo time has expired." '437 Patent at 35:54–57; *see id.* at 8:6–10 ("erased . . . or re-scrambled"), 9:9–11 ("The data may be scrambled, encrypted, or otherwise locked from viewing or playback (audio) until the user agrees to pay for access.") & 34:34–40 ("erasing, encrypting or scrambling the data product").

None of these disclosures supports reading "or" in the claims as necessarily being an exclusive "or," and Defendants have not otherwise justified imposing such a restriction. In other words, Defendants have not shown that the recitals of deleting "or" scrambling "or" blocking necessarily preclude a combination thereof. *Compare DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, No. 2:12-CV-764, 2015 WL 164072, at *3 (E.D. Tex. Jan. 13, 2015) (Bryson, J.) ("It is well recognized that the word 'or' can be used in either an inclusive or an exclusive sense, depending on context.") *with Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1330 (Fed. Cir. 2001) (affirming construction that "either . . . or" meant "a choice between either one of two alternatives, but not both").

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521

F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"by deleting or scrambling said data from said built in storage device or blocking further access to said data"** to have its **plain meaning**.

**P.  "a storage device built in to the system and which is not removable from the system . . ."**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "a storage device that is not removable from the system without rendering the system inoperable" |

(Dkt. No. 35, Ex. A, at 18.)  The parties submit that this term appears in Claim 1 of the '437 Patent.  (Dkt. No. 35, Ex. A, at 18.)

Defendants submit that "[t]he parties have agreed to plain meaning" for this term.  (Dkt. No. 42, at 1 n.1.)

Because this term is no longer disputed, the Court does not further address this term.

**Q.  "a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "a user interface operatively connected to the processing circuitry for customizing the received data" |

(Dkt. No. 35, Ex. A, at 19; Dkt. No. 42, at 21; Dkt. No. 44, Ex. A, at 23.)  The parties submit that this term appears in Claim 1 of the '437 Patent.  (Dkt. No. 35, Ex. A, at 19; Dkt. No. 44, Ex. A, at 23.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Def[endants]' proposal of 'customizing')."

(1)  The Parties' Positions

Plaintiff argues that "[a] jury would be able to understand a user interface being connected to processing circuitry to program the various functionality of the invention."  (Dkt. No. 36, at 23.)  As to Defendants' proposed construction, Plaintiff argues that "[w]hile customization of data may be one aspect of the preferred embodiment of the invention, the claim is not limited to customization."  (*Id.*)

Defendants respond that "[Plaintiff] argues that a jury would understand these terms, but fails to clarify what the claimed 'processing functions' are or how a jury would recognize them." (Dkt. No. 42, at 21.)

Plaintiff replies: "That the patent discloses display and recording functions that do not customize, alter, or change the data in any way as 'processing' is conclusive evidence that [Defendants'] construction is wrong."  (Dkt. No. 45, at 9.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

(2)  Analysis

Claim 1 of the '437 Patent recites (emphasis added):

1.  A system for the processing, recording, and playback of audio or video data, comprising:
      a. a receiver apparatus for receiving audio or video data from at least one data feed;
      b. memory circuitry comprising a storage device built in to the system and which is not removable from the system;
      c. processing circuitry for processing the data and for storing the processed data in the built in storage device;

*d. a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data by the processing circuitry;*

e. playback circuitry, which reads the data from the built in storage device and which converts the data to electronic signals for driving a playback apparatus; and

f. a microprocessor having software programming to control the operation of the processing circuitry and the playback circuitry enabling the recording of rented data and enacting a simulated return of said rented data by deleting or scrambling said data from said built in storage device or blocking further access to said data, and notifying a data supplier of said simulated return.

On one hand, the specification discloses:

Processing may include recording, editing, condensing, rearranging data segments, displaying, or otherwise *customizing* the content. This is especially useful when the User Suitability Criteria is a ratings based edit. The processor decodes the received content, interprets the control information, updates the previously stored control information, and then automatically edits the signal to censor unsuitable content (e.g., bleep out expletives, or eliminate scenes involving nudity or graphic violent or sexual content). The *processed* data may then be played back though the playback unit in real time and/or sent to the recording unit to be recorded onto the non-movable storage device for later access, editing, and/or playback by the playback unit.

'437 Patent at 8:40–52 (emphasis added).

On the other hand, as Plaintiff has emphasized, the specification discloses "V-Chip program blocking" that can "merely block[] out entire programs that are considered 'unsuitable.'" *Id.* at 8:26–28 & 14:57. This disclosure weighs against Defendants' proposal of "customizing."

On balance, Defendants have not shown that "customizing" is a limitation of the disputed term or that any construction is otherwise necessary, and the Court therefore hereby expressly rejects Defendants' proposed construction. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d

at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

The Court accordingly hereby construes **"a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data"** to have its **plain meaning**.

**R. "a user interface operatively connected to said processing circuitry for programming one or more processing functions to be performed by said processing circuitry" / "a user interface operatively connected to the processing circuitry for programming the at least one processing function"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "a user interface operatively connected to the processing circuitry for customizing the [limited-use / rented] digital data" |

(Dkt. No. 35, Ex. A, at 22; Dkt. No. 44, Ex. A, at 36–40.)  The parties submit that this term appears in Claims 1, 35, and 68 of the '029 Patent.  (Dkt. No. 35, Ex. A, at 22; Dkt. No. 44, Ex. A, at 36.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposal of 'customizing')."

(1)  The Parties' Positions

Plaintiff incorporates its arguments as to the similar term "a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data," which is addressed above.  (*See* Dkt. No. 36, at 23; *see also* Dkt. No. 45, at 9.)

Defendants likewise address all of these terms together.  (*See* Dkt. No. 42, at 21–22.)

At the February 2, 2017 hearing, the parties presented no oral argument as to this disputed term.

(2) Analysis

For the same reasons set forth above as to the similar term "a user interface operatively connected to the processing circuitry for programming which processing functions are to be applied to the received data," the Court finds that no construction is necessary.

The Court accordingly hereby construes **"a user interface operatively connected to said processing circuitry for programming one or more processing functions to be performed by said processing circuitry"** and **"a user interface operatively connected to the processing circuitry for programming the at least one processing function"** to have their **plain meaning**.

**S. "portable playback device"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "plain meaning" | "portable device with a speaker system and a display on the device" |

(Dkt. No. 35, Ex. A, at 23; Dkt. No. 42, at 24–25; Dkt. No. 44, Ex. A, at 60–71.)  The parties submit that this term appears in Claims 1, 19, 20, 31, 32, 35, 38, 41, 53, 54, 59, 64, 65, and 68 of the '029 Patent.  (Dkt. No. 35, Ex. A, at 23; Dkt. No. 44, Ex. A, at 60.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (reject Defendants' proposal of 'a speaker system and a display on the device')."

(1) The Parties' Positions

Plaintiff argues that the specification contains no support for Defendants' proposal that a "portable playback device" must include a display.  (Dkt. No. 36, at 24.)

Defendants respond that "[o]nly [Defendants'] construction properly reconciles the addition of the word portable to the term 'playback device.'" (Dkt. No. 42, at 25.) Defendants also argue: "[Plaintiff] confuses the term 'portable playback device' with what the specification refers to as a 'stand alone playback unit' or a 'portable recorder/player.' While [Defendants] agree[] with [Plaintiff's] assertion that a 'portable playback device' is capable of reading content from a video cassette or DVD, the only feasible construction of portable playback device requires a portable device with a display or speaker system." (*Id.*, at 26.)

Plaintiff replies that "the specification distinguishes the playback device from the speaker/display system as separate components." (Dkt. No. 45, at 9.)

At the February 2, 2017 hearing, Defendants urged that the phrase "portable playback" must be given meaning so that the term "portable playback device" does not encompass a mere storage device.

(2) Analysis

On one hand, the specification discloses a playback device that appears to include a speaker system and an LED display:

> Once the received signal has been processed, it may be stored for future use on the built-in, non-movable storage device 4, or immediately accessed for present use. If needed for present use, the processed data is transmitted from the microprocessor 3 to a playback device 5, which interprets the processed data and prepares it for display. For example, an audio signal is received from a compact disc player at receiver 2, and then processed and decoded by microprocessor 3 so that any audio data is separated from CD-I information on the disc. Once the data has been fully processed in the microprocessor 3, it is sent to the *playback device 5 which plays back the audio data through a speaker system and displays the CD-I information on a LED display*.

'029 Patent at 13:9–21 (emphasis added); *see id.* at 15:2–3, 15:16–20 & 25:14–17; *see also id.* at Cl. 32 ("32. The system of claim 1, wherein the portable playback device is selected from a

group consisting of a portable telephone, portable digital recorder/player, a portable computer, a PDA, nd [*sic*, and] combinations thereof.")

On the other hand, Figures 1 and 2a illustrate a "playback device 5" and a "playback device 15," respectively, that are connected "To Display," which implies that a display need not be integrated with each "playback device." *See id.* at 13:18–21 & 15:14–21. Also, the specification refers to a "DVD player" or "VCR" as examples of a "stand alone playback unit":

> Once receipt of the data is acknowledged by the VPR/DMS and the transaction is completed, the user may play back the data product, store it, or transfer it to portable medium for use on a stand alone playback unit (e.g., DVD player, VCR, etc.) provided all necessary transactions are completed.

*Id.* at 7:61–66. Because the specification refers to a VCR as being "well known equipment" (*id.* at 6:43–44), the ordinary meaning of VCR appears to apply, in particular as to a VCR being a device that can record and play but that usually does not itself have a display or a speaker system. The distinct disclosures of TV/VCR and TV/DVD combinations further support this interpretation. *See id.* at 10:41–44 ("For example, in the television and video market there exist television/VCR combinations 'bundles' which include a television set and a video cassette recorder combined into the same enclosure."); *see also id.* at 2:33 ("regular DVD players") & 10:45–46 ("TV DVD combination"). Further, the specification discloses "radio" embodiments and "radio broadcasts," and playback of "radio" presumably could be achieved without any display. *See, e.g., id.* at 10:36–41, 10:51–54, 12:24–34, 22:28, 24:46 & 33:64–67.

Figure 8 of the '029 Patent is also consistent with not requiring a display or speakers because Figure 8 illustrates a "portable recorder/player 19" without any apparent display or speakers, as contrasted with the "user's audio/video system 36" illustrated in Figure 8. *See* '029 Patent at 29:44-47.

Finally, Defendants submit that "[t]he Federal Circuit recently held that the term 'portable' was subject to multiple constructions and thus [Plaintiff's] request for 'plain and ordinary meaning' is inappropriate." (Dkt. No. 42, at 25 (citing *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016)).) Yet, Defendants themselves include the word "portable" in their proposed construction without explicitly setting forth any special meaning for "portable." As to Defendants argument that the word "portable" means that the disputed term requires a display and a speaker system built into the playback device, no such limitation is evident in the intrinsic evidence cited by the parties, such as discussed above, or in the extrinsic evidence submitted by Defendants (*see* Dkt. No. 42, at 25–26). In short, the foregoing evidence demonstrates that Defendants have not shown that what is "portable" must be everything that is necessary for the user to fully experience "playback." Instead, the above-discussed evidence demonstrates that what is portable is merely the "device."

To the extent that Defendants have argued that Plaintiff is improperly conflating "portable playback device" and "portable storage device," Defendants' argument appears to bear upon factual questions as to application of the claims to the accused instrumentalities rather than any legal question for claim construction. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("The resolution of some line-drawing problems . . . is properly left to the trier of fact.") (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact")); *see EON*, 815 F.3d at 1318-19 (citing *PPG*).

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"portable playback device"** to have its **plain meaning**.

### T. "processing circuitry comprising software . . ."

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary: Not subject to §112(6). | Subject to §112, ¶6 <br><br> Indefinite <br><br> Function: <br> "controlling operations of said memory circuitry and said playback circuitry and controlling at least one operation performed upon the stored limited-use digital data as permitted by at least one restriction on the use of the limited-use digital data and transferring to a portable playback device the stored limited-use digital data and control data for use by the portable playback device for performing a virtual return of the limited-use digital data that has been transferred to the portable playback device." <br><br> Structure: <br> microprocessor 3 without a disclosed algorithm |

(Dkt. No. 35, Ex. A, at 24–26; Dkt. No. 42, at 26; Dkt. No. 44, Ex. A, at 71–77.) The parties submit that these terms appear in Claims 1, 35, and 68 of the '029 Patent. (Dkt. No. 35, Ex. A, at 24–26; Dkt. No. 44, Ex. A, at 71.)

Shortly before the start of the February 2, 2017 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning (35 U.S.C. § 112, ¶ 6 does not apply)."

(1)  The Parties' Positions

Plaintiff argues that Defendants cannot overcome the presumption that 35 U.S.C. § 112, ¶ 6 does not apply to these non-means terms.  (Dkt. No. 36, at 25.)

Defendants respond that "[Plaintiff] attempts to engage in purely functional claiming in a system claim, thereby improperly claiming all potential structures for performing each claimed function."  (Dkt. No. 42, at 26.)

Plaintiff replies by reiterating that Defendants fail to rebut the presumption against means-plus-function treatment.  (Dkt. No. 45, at 10.)  Alternatively, Plaintiff argues that "[i]n any event, the '029 Patent discloses definite structure to perform the recited functions."  (*Id.*)

At the February 2, 2017 hearing, Defendants reiterated their arguments.

(2)  Analysis

Claim 1 of the '029 Patent, for example, recites (emphasis added):

1.  A system for receiving, processing, and playback of limited-use digital data, comprising:
    circuitry for receiving limited-use digital data;
    memory circuitry for storing the limited-use digital data as stored limited-use digital data;
    playback circuitry that reads the stored limited-use digital data from said memory circuitry and converts the stored limited-use digital data to electronic signals for driving a playback device;
    *processing circuitry comprising software* to control operations of said memory circuitry and said playback circuitry and to control at least one operation performed upon the stored limited-use digital data as permitted by at least one restriction on the use of the limited-use digital data;
    a user interface operatively connected to said processing circuitry for programming one or more processing functions to be performed by said processing circuitry; and

at least one digital output operatively connected to said processing circuitry that communicates with a data supplier to allow monitoring by the data supplier of the at least one operation performed upon the stored limited-use digital data as permitted by the at least one restriction on the use of the limited-use digital data,

*wherein said processing circuitry further comprises* a program for transferring to a portable playback device the stored limited-use digital data and control data for use by the portable playback device for performing a virtual return of the limited-use digital data that has been transferred to the portable playback device.

Title 35 U.S.C. § 112, ¶ 6 (which has since been renamed § 112(f)) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption

as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)).  In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word."  792 F.3d at 1350.

Here, "processing circuitry" is not a "nonce" term (*see id.*) but rather connotes a class of structures.  In particular, Plaintiff's expert has persuasively opined that "circuitry" here refers to a particular class of hardware structures.  (*See* Dkt. No. 36, Ex. F, Dec. 9, 2016 Kesan Decl., at ¶ 35; *see also* '029 Patent at 4:34–40 ("processing devices").)  Further, surrounding claim language provides details regarding how the "processing circuitry" "interacts with other components . . . in a way that . . . inform[s] the structural character of the limitation-in-question or otherwise impart[s] structure . . . ." *Williamson*, 792 F.3d at 1351.

In so finding, the Court applies long-standing principles articulated prior to the abrogated *Lighting World* decision.  *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply"; noting "language reciting [the circuits'] respective objectives or operations"); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) ("While we do not find it necessary to hold that the term 'circuit' by itself always connotes sufficient structure, the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."); *Personalized Media Commc'ns, LLC v. Int'l Trade*

*Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.'  We therefore conclude that the term 'detector' is a sufficiently definite structural term to preclude the application of § 112, ¶ 6."); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because it denotes a type of device with a generally understood meaning in the mechanical arts);[4] *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) (finding that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions").

In sum, Defendants have failed to overcome the presumption against means-plus-function treatment for these non-means terms.  The Court therefore hereby expressly rejects Defendants' proposal of means-plus-function treatment, as well as Defendants' corresponding indefiniteness arguments.  No further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"processing circuitry comprising software . . ."** to have its **plain meaning**.

---

[4] *Greenberg*, 91 F.3d at 1583 ("'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms"); *id.* ("It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.'  What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.").

## VI.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit, and in reaching conclusions the Court has considered and relied upon extrinsic evidence.  The Court's constructions thus include subsidiary findings of fact based upon the extrinsic evidence presented by the parties in these claim construction proceedings.  *See Teva*, 135 S. Ct. at 841.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 13th day of February, 2017.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE